UTILITY CONTRACTORS ASS'N OF NEW ENGLAND, INC., W. Walsh Company, Inc., I.W. Harding Construction, Inc., and Dennis Dugan, Plaintiffs,

v.

CITY OF WORCESTER, Defendant.

No. CIV.02–11877–NG.

United States District Court, D. Massachusetts.

Dec. 23, 2002.

Richard D. Wayne, Brian E. Lewis, Hinckley, Allen & Snyder, Boston, MA, for Utility Contractors Ass'n of New England, Inc., W. Walsh Company, Inc., I.W. Harding Construction, Inc., Dennis Dugan, Plaintiffs.

David M. Moore, Worcester, MA, for City of Worcester, Defendant.

### *MEMORANDUM AND ORDER*

GERTNER, District Judge.

This is a case brought under the Privileges and Immunities Clause of Article IV of the United States Constitution to challenge the City of Worcester's use of a "Residency Requirement Ordinance" in its public works projects. The Residency Requirement Ordinance requires that all private contractors or subcontractors on such projects allocate 50% of their total employee work hours to Worcester residents. The plaintiffs seek a preliminary injunction to stay enforcement of the ordinance while this case is pending.

There are serious issues on both sides of this case. On the one hand, the City emphasizes Worcester's depressed financial situation and the importance of giving jobs to its residents, many of whom are anxiously awaiting the outcome of this case. The City also underscores the impact of a delay in the current municipal building project—the construction of a new voca-

tional school. The project is reputedly one of the largest public works projects in the City's history, and the school is desperately needed.

The plaintiffs point to the fact that the ordinance obviously disadvantages citizens from outside of Worcester and from other states, presumably including citizens with equally pressing needs. Their interests are not technical or unimportant. They derive from the Privileges and Immunities Clause of the Constitution, which guarantees to every citizen of the country all the rights and privileges enjoyed by every other citizen. The Privileges and Immunities Clause played and continues to play a critical role in "fus[ing] into one Nation a collection of independent, sovereign States." *Toomer v. Witsell*, 334 U.S. 385, 395, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948).

Furthermore, plaintiffs maintain that if enjoining this residency preference leads to the disruption of existing projects, it is because the City failed to follow the overwhelming case law invalidating similar residency preferences, and specifically, failed to heed the concerns plaintiffs brought to the City five months ago.

While it is troubling to see this important project delayed, and to upset the expectations of Worcester residents, the law gives me no choice. The cases could not be clearer. The constitutional issues could not be more significant. In the absence of legally sufficient evidence from the town to justify the ordinance at this stage of the proceedings, an injunction must issue. For the reasons set forth below, I **GRANT** the plaintiffs' motion.

## I.   *FACTS/PROCEDURAL HISTORY*

The residency requirement ordinance ("RRO") at issue in this case dates back to 1984 and is found in Chapter 2, Section 32 of the City of Worcester's Revised Ordinances:

On any project for the construction, reconstruction, installation, demolition, maintenance or repair of any building, or public work, costing in excess of twenty-five thousand dollars, to be funded in whole or in part by city funds, or funds which, in accordance with a federal or state grant, program, or otherwise, the city expends or administers, ... the provisions of this section shall apply and the same shall be referenced in every invitation to bid for such project and[ ] the following paragraphs shall be contained in every resulting contract therefrom:

"It shall be a material breach of this contract if the contractor and each subcontractor on a craft-by-craft basis shall not at all times provide at least fifty percent of the total employee worker-hours in each trade, at every tier, to be performed by bona fide residents of the city of Worcester."

Contractors are further required to make reference to this provision and its requirements in contracts with subcontractors, who must in turn notice the requirement in all their dealings with subcontractors. Section 35(d) of Chapter 2, Worcester's "Responsible Employer Ordinance," ("REO") lists the penalties for a contractor's noncompliance with the RRO, which include suspension from work on the project, withholding of payment by the City, permanent removal from the project, or an assessment against the contractor for each week that the contractor fails to comply. The City may waive the residency requirement upon a contractor's showing that compliance is not feasible, despite its bona fide efforts. Rev. Ordinances for the City of Worcester c. 2, § 32(c).

The plaintiffs in this case include (1) the Utility Contractors Association of New England, Inc. ("UCANE"), self-described as "a non-profit corporation that repre-

sents more than 100 union and non-union contractors who are principally engaged in public construction in the Commonwealth of Massachusetts and other New England states, as well as more than 100 material-men, suppliers, and associate members;" (2) two construction contracting companies, W. Walsh Company, Inc. and I.W. Harding Construction, Inc.; and (3) Dennis Dugan, a citizen of New Hampshire. The complaint pleads that Dugan and the contractor plaintiffs all regularly work on the type of municipal public works projects that, if done in Worcester, would fall within the scope of the RRO.

In August 2002, the plaintiffs adopted the view that the RRO and REO were unconstitutional. After several letters from counsel to City officials failed to elicit the desired response from the City—elimination of the residency requirement—the plaintiffs filed suit in Massachusetts Superior Court of Norfolk County on September 3, 2002. The complaint sought a declaration that the RRO was unconstitutional. On September 9, 2002, the City announced a bid specification for the construction of a new vocational school building, a project reputed to be one of the largest public works projects in the City's history. Consistent with Worcester policy, the announcement gave notice of the residency requirement. The defendants removed the case to federal court on September 24, 2002.

The City initially planned to open bids for the school project on November 26, 2002, and on November 25 the plaintiffs moved for a temporary restraining order that would suspend the RRO. As it hap-

pened, the City had, for other reasons, pushed back the bid-opening date to December 3, 2002. The parties appeared on November 6 for a hearing on the temporary restraining order, which the court allowed until December 11, 2002. On that date the parties reappeared to argue whether the existing temporary restraining order should stay in place as a preliminary injunction.

## II. *DISCUSSION*

■ To prevail on a motion for a preliminary injunction, the plaintiffs must satisfy the Court (1) that they are likely to succeed on the merits of their claims; (2) that irreparable harm will follow absent entry of an injunction; (3) that the benefits flowing from the injunctions will, on balance, outweigh the burdens imposed; and (4) that the injunction comports with the public interest. *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 990 F.2d 25, 26 (1st Cir.1993); *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 5 (1st Cir.1991). The showing of a strong likelihood of success on the merits, if made, is a point in the plaintiffs' favor in the balancing of interests. *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 612–13 (1st Cir.1988); *AccuSoft Corp. v. Mattel, Inc.*, 117 F.Supp.2d 99, 102 (D.Mass.2000).

### A. *Likelihood of Success on the Merits*

■ The Privileges and Immunities Clause gives constitutional assurance that "The Citizens [1] of each State shall be enti-

---

**1.** The City protests that three of the plaintiffs lack standing to sue because the Privileges and Immunities Clause protects "citizens," and not corporate entities. The case law seems to bear this out. *See, e.g., Hemphill v. Orloff*, 277 U.S. 537, 548–50, 48 S.Ct. 577, 72 L.Ed. 978 (1928); *see also Metropolitan Life*

*Ins. Co. v. Ward*, 470 U.S. 869, 884, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985) (O'Connor, J., dissenting) ("Appellants rely on the Equal Protection Clause because, as corporations, they are not "citizens" protected by the Privileges and Immunities Clause of the Constitution."). Nonetheless, an individual citizen is

tled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1. It is the purpose of the Clause to protect, *inter alia,* the rights of citizens to pursue a common calling, to hold and dispose of property, and to petition in the courts of states in which they do not reside. *Baldwin v. Fish & Game Comm'n of Montana,* 436 U.S. 371, 383, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978) (citing *Ward v. Maryland,* 12 Wall. 418, 79 U.S. 418, 421–22, 20 L.Ed. 449 (1871) (common calling); *Blake v. McClung,* 172 U.S. 239, 249, 19 S.Ct. 165, 43 L.Ed. 432 (1898); and *Canadian N. Ry. v. Eggen,* 252 U.S. 553, 563, 40 S.Ct. 402, 64 L.Ed. 713 ("reasonable" access to courts)).[2] The Supreme Court has held that, to the extent they disadvantage out-of-state residents as a class, residency requirement ordinances like the one at issue in this case can run afoul of the Privileges and Immunities Clause. *United Bldg. & Constr. Trades Council of Camden & Vicinity v. Mayor & Council of the City of Camden,* 465 U.S. 208, 216, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984) (hereinafter *"Camden "*).

The *Camden* case involved a Camden, New Jersey ordinance that required contractors to assign 40% of their work-hours to Camden residents. The defendants argued—unsuccessfully to the Third Circuit—that the Clause should not apply be-

cause it did not disadvantage only out-of-state residents; nonresidents of Camden who lived in New Jersey were on the same unequal footing as out-of-staters. The Court rejected this position, stating flatly, "We have never read the Clause so literally as to apply it only to distinctions based on state citizenship." *Id.* By definition, a municipal residency requirement disfavors out-of-state residents as a class, with the result that "whether the exercise of a privilege is conditioned on state residency or on municipal residency [an out-of-stater] will just as surely be excluded." *Id.* at 217, 104 S.Ct. 1020.

There is simply no question that the Worcester RRO is susceptible to Privileges and Immunities Clause review in this case. But the inquiry does not end there. The Supreme Court has settled upon a two-part standard for assessing challenges brought under the Clause, once the classification burdening out-of-staters is established. First, courts must determine whether the classification strikes at the heart of an interest so "fundamental" that its derogation would "hinder the formation, the purpose, or the development of a single Union of [the] States." *Baldwin,* 436 U.S. at 383, 98 S.Ct. 1852, *quoted in Camden,* 465 U.S. at 218, 104 S.Ct. 1020.[3]

included among the plaintiffs, and for good measure the corporate plaintiffs argue that they are suing on behalf of their aggrieved individual workers.

The case law nowhere suggests that a noncitizen *cannot sue* under the Privileges and Immunities Clause to invalidate a practice that discriminates against out-of-state citizens. Indeed, the Court in *Camden* seemed unconcerned that the sole petitioner before the Court in that case was a corporation, because the challenged residency requirement was found to have a discriminatory effect on citizens. *United Bldg. & Constr. Trades Council of Camden & Vicinity v. Mayor & Council of the City of Camden,* 465 U.S. 208, 104 S.Ct.

1020, 79 L.Ed.2d 249 (1984). *Hemphill* presented the converse situation—an individual asserting that a state's corporate form requirements were invalid because they discriminated against out-of-state *corporations.*

2. The Supreme Court in *Blake* also recognized the rights of citizens under the Privileges and Immunities Clause to travel in and pass through alien states and to petition for habeas corpus. *Blake,* 172 U.S. at 249, 19 S.Ct. 165.

3. The *Baldwin* Court emphasized that it is not the case that "state citizenship or residency may never be used by a State to distinguish among persons." *Baldwin,* 436 U.S. at 383,

■ If the classification bears on such a "fundamental" right, the analysis proceeds to a second stage, where the defendant can overcome the challenge by showing a "substantial reason" for the difference in treatment. *Camden*, 465 U.S. at 222, 104 S.Ct. 1020 (citing *Toomer*, 334 U.S. at 396, 68 S.Ct. 1156). The reasons cited by the defendant must demonstrate that nonresidents are "a peculiar source of evil" and that the discrimination imposed "bears a close relation" to the purposes of the classification. *Toomer*, 334 U.S. at 396, 398, 68 S.Ct. 1156. The defendant must also show that there was no "less restrictive means" to accomplish its lawful ends. *Sup. Ct. of New Hampshire v. Piper*, 470 U.S. 274, 284 n. 17, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985) (citing *Toomer*, 334 U.S. at 398–99, 68 S.Ct. 1156).[4]

Worcester's RRO unequivocally bears on "fundamental" rights for Privileges and Immunities Clause purposes. The Clause protects employment opportunities with private employers, even where those private employers are contractors working on city-funded projects. *Camden*, 465 U.S. at 221–22, 104 S.Ct. 1020. The ordinance at issue in *Camden* was almost identical in approach to Worcester's (except that Camden's residency requirement was 40% and Worcester's is 50%), and the Court held that the out-of-state plaintiffs had satisfied this first element of the Privileges and Immunities test. *Id.* The City does not dispute this point.

The more difficult question in this case is whether Worcester has a "substantial reason" for its discrimination in this instance. The City points to adverse employment conditions in Worcester as its justification, offering evidence that in recent years *per capita* wealth in Worcester has decreased against a national index on the rise. Property taxes are increasingly eroding the income of Worcester residents, and the share of Worcester residents working in the construction industry increased minimally in the 1990s. An amicus brief testifies to the efforts of local churches and business associations to recruit and train Worcester residents—particularly women and minorities—to work in the building and construction trades. The RRO is alleged to be a crucial component of that effort.

The plaintiffs object that it is inappropriate for Worcester to come forth at this late date with *post hoc* justifications rooted in conditions that did not exist when the ordinance was enacted in 1984. They rely on *Hicklin v. Orbeck*, 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978), where, in the course of assessing a broad-brush Alaska state residency requirement for work in the oil and gas industries, the Court reviewed findings of the Alaska leg-

98 S.Ct. 1852. For example, a state need not extend the right to vote to nonresidents or allow an out-of-state candidate to run for elective office in the state. *Id.*

**4.** The City of Worcester claims that the plaintiff bears the burden of proof as to all issues here, including proving that there is no "substantial reason" for the ordinance. The case law and commentary suggest otherwise. It is the defendant's burden and it is a substantial one. "The standard of review employed in *Toomer*, ... *Piper*, and *Camden*—characterized by a shift in the burden of proof to the discriminatory state and by an insistence on a

fairly precise fit between the remedy and classification—is almost as demanding as that elaborated by the Warren Court in equal protection and first amendment strict scrutiny." Laurence Tribe, *American Constitutional Law*, § 6–35, at 544 (2d ed.1988); *see also* Patrick Sullivan, *In Defense of Resident Hiring Preferences: A Public Spending Exception to the Privileges and Immunities Clause*, 86 *Cal. L.Rev.* 1335, 1346–47 (suggesting that the Court has imposed "something akin to a 'strict scrutiny' analysis" in its Privileges and Immunities Clause jurisprudence).

islature prior to enactment. *Id.* at 526–27 n. 10, 98 S.Ct. 2482.

However, the Court in *Hicklin* did not expressly require that the justification had to be contemporaneous with the ordinance. Perhaps in recognition of this, the plaintiffs also press a First Amendment case, *T & D Video, Inc. v. Revere,* 423 Mass. 577, 670 N.E.2d 162 (1996), where the court granted a preliminary injunction against enforcement of a city ordinance because the city could not muster evidence of a valid government interest at the time of the ordinance's enactment. *Id.* at 581, 670 N.E.2d 162 ("Mere conclusions asserted after an ordinance's enactment regarding the secondary effects of adult entertainment facilities or merchandise are insufficient to show that the ordinance was designed to serve a substantial governmental interest.").

The City counters that, quite the contrary, a contemporaneous justification is required as a matter of both law and logic. Accepting the plaintiffs' view would lead to the incongruous result that a discriminatory statute, justified at the time of its enactment, would be unassailable into perpetuity, even if the conditions that justified the discrimination were subsequently resolved.

The First Circuit gives some guidance on this issue, suggesting that disapproval of *post hoc* justifications is directed at situations where lawyers performing damage control retrospectively contrive a justification that did not occur to the lawmaker in the first instance. *Action for Boston Community Development v. Shalala,* 136 F.3d 29, 34 (1st Cir.1998).

That does not appear to be the case here, as Worcester expressed its motivation clearly in the RRO:

The city council finds and determines that there is unemployment in the city; that the subsequent multiplier effect of said unemployment in the city has a direct and deleterious effect upon all the neighborhoods and areas of the city, resulting in vandalism, crime, and the physical deterioration of neighborhoods and areas; that the city expends municipal funds for public buildings and public works contracts, a large portion of said money being derived from taxes paid by city residents; that a large portion of workers employed on such projects are individuals who do not reside in the city of Worcester; and that the jobs preference established by this section will tend toward the lessening of the deleterious effects cited herein.

Rev. Ordinances of the City of Worcester, c. 2, § 32(a). These findings are consistent with the justifications that the City proposes now.

The question then, is whether the City's reasons are "substantial" and whether the RRO's discrimination is "closely related" to them. In *Hicklin,* the Court expressed doubt that a defendant could identify unemployment in its community as the substantial reason to justify its discrimination. *Hicklin,* 437 U.S. at 526, 98 S.Ct. 2482. Later on, in *Camden,* the Court did not rule out the possibility, remanding the case to the trial court so that the city could litigate whether the ordinance was "necessary to counteract grave economic and social ills" in the city. *Camden,* 465 U.S. at 222–23, 104 S.Ct. 1020 (noting that governments should have "considerable leeway in analyzing local evils and in prescribing appropriate cures").

Though I am deeply moved by the City's arguments and the submissions of amici describing in detail the efforts Worcester has made, through the RRO and otherwise, to empower its residents, the case law compels me to find that the plaintiffs are likely to succeed on the merits of this claim. Even if I were to accept that poor

economic conditions are a sufficiently substantial reason to defeat the plaintiffs' claim (and I have seen no case that has so held),[5] I cannot accept that nonresidents are the peculiar source of the evils Worcester has described as the *Camden* case requires. *Id.* at 228, 104 S.Ct. 1020. It is more than a stretch to suggest that nonresident employment on public construction projects—or in the construction sector generally—is responsible for the far-reaching economic problems the City describes. Discrimination predicated on such a finding smacks of the very interstate protectionism that the Privileges and Immunities Clause is intended to combat. *Piper*, 470 U.S. at 285 n. 18, 105 S.Ct. 1272 (noting that the Privileges and Immunities Clause prohibits discriminatory measures directed at making in-staters more competitive).

Moreover, it is far from clear that the discrimination enshrined in the RRO bears a close relationship to the grander economic conditions in Worcester. The law requires a neat fit between the discrimination and the objectives that allegedly justify it. Here the effect of the RRO upon citywide unemployment is minimal. Eighteen years of the RRO have not resolved the economic and social conditions that, according to the City, required its enactment. Worcester identifies substantially the same conditions today as the council did in 1984. Clearly the RRO's discrimination is not closely related to problems of

this magnitude. *See Opinion of the Justices to the Senate*, 393 Mass. 1201, 1205–06, 469 N.E.2d 821 (1984).

*Opinion of the Justices* addressed a proposed residency preference for state public works projects that would trigger on a finding by state officials that "critical unemployment conditions exist in an employment area and that employment opportunities for Commonwealth residents 'are decreased due to the employment of nonresidents ... in that area ....'" *Id.* at 1204, 469 N.E.2d 821 (quoting the legislation) (alterations in original). In the "close relationship" stage of its analysis, the Supreme Judicial Court observed that "[p]referring employed residents would not directly serve to reduce unemployment in an area, although it could serve to increase employment opportunities for some persons." *Id.* at 1205, 469 N.E.2d 821. As a result, the Court held that, even if it accepted a combination of "critical unemployment conditions" and nonresident impact on employment opportunities as a substantial reason for the discrimination, the proposed residency requirement failed the "close relationship" test. *Id.* at 1206, 469 N.E.2d 821.

Even anticipating more fully developed findings at the trial stage,[6] I find no reason to deviate from the Supreme Judicial Court's view. The RRO falls indisputably within the purview of the Privileges and Immunities Clause: it discriminates

---

5. To the contrary, Massachusetts state courts have invalidated a number of similar public-works residency requirement ordinances since the Supreme Court ruled in *Camden*. *See, e.g., Opinion of the Justices to the Senate*, 393 Mass. 1201, 1206, 469 N.E.2d 821 (1984); *Utility Contractors Ass'n of New England, Inc. v. City of Lowell*, No. 01–0473, 2001 WL 34059083 (Mass.Super. Ct. Norfolk Cty. Dec. 19, 2001).

6. The structure of the Privileges and Immunities Clause does not make the case at this stage, as the City urges, that the plaintiff must raise and dispatch any potential justification that the City might identify at trial. The standard for a preliminary injunction is the likelihood of success, not certainty of success. *Shammas v. Merchants Nat'l Bank*, 1990 WL 354452, at *2 (D.Mass. Nov. 9, 1990) (citing 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2948, at 452 (1973)).

against nonresidents in their exercise of a fundamental privilege. Though the Clause admits the possibility that such discrimination may be justified, the level of scrutiny that the case law imposes is exacting, and I find that the plaintiffs have established a likelihood of success on the merits.

## B.  *Irreparable Harm*

■ The plaintiffs urge that, if a preliminary injunction does not enter, the harms that inhere in the RRO's discrimination would follow in exaggerated fashion, as the residency requirement would continue to apply to the ambitious vocational school project. They allege that the RRO disadvantages bidders who employ predominantly nonresident workers, because they will have to adjust their bids upward—if they are not completely deterred by the residency requirement from bidding at all.

The City complains that the plaintiffs "manufactured" their own irreparable harm by waiting until the eve of the vocational school bid process to file for their temporary restraining order and preliminary injunction. But the plaintiffs' delay does not at all compromise their articulation of irreparable harm, particularly at the preliminary injunction stage. It was a foregone conclusion in September that bidding on the school project was slated to proceed while this case was pending. Whether the plaintiffs filed for their relief in September or December, the alleged harm was the same.

The plaintiffs had already filed suit against the City at the time it released its bid specification in September—Worcester chose to give notice of the RRO in that specification notwithstanding the lawsuit. The City had several alternative options available to it on September 9. It might have moved preemptively for a declaration of the RRO's constitutionality or voluntarily suspended the RRO while the lawsuit was pending. It elected to press ahead, business as usual, with the challenged RRO, and took the risk that the plaintiffs would seek injunctive relief.

## C.  *Balance of Harms*

■ The City counters that the proposed injunction, if entered, will work more harm on the City than the plaintiffs would suffer without it. Worcester suggests a variety of adverse consequences flowing from the injunction: its school system's loss of vocational accreditation, lost educational opportunities for Worcester school students, a lost opportunity for racial integration of the schools by assembling all of the City's vocational students under one roof, and planned environmental benefits from the construction.

All of these outcomes presume that suspension of the RRO will scuttle the vocational school project. At oral argument the City conceded that at worst a preliminary injunction would only require the City to issue a revised bid specification so that contractors could factor the RRO out of their bids. Defense counsel suggested that this would set the project back several months. Nowhere in its papers did the City explain how a preliminary injunction targeted only at the RRO would frustrate the school project outright. The anticipated benefits of the school project would be delayed in their arrival, but would still come to pass. Given the plaintiffs' substantial likelihood of success on the merits, I am entitled to discount the harm to the City still further, as it is substantially *unlikely* that these ill effects would not be justified. *Concrete Mach. Co.,* 843 F.2d at 612–13; *AccuSoft Corp.,* 117 F.Supp.2d at 102.

## D.  *The Public Interest*

As both parties endeavor to equate their interests with the public's, the same ten-

sions apply to the analysis here. Worcester cites the public harm of delaying the school project and its myriad benefits, and invokes the public interest in "the presumption that the actions and ordinances of its government are lawful." The plaintiffs respond with the well-taken argument that the costs of compliance with the residency requirement are passed on to the public, because the RRO artificially inflates the bids of contractors. The plaintiffs also recite the social value of protecting the public from unconstitutional laws.

This factor does not clearly favor the defendant—an injunction here certainly would not disserve the public interest. And again, the plaintiffs' strong likelihood of success on its claims makes it unlikely that the delay to the vocational school project will prove to be unjustified at trial. *See Saenger Organization, Inc. v. Nationwide Insurance Licensing Assocs.,* 864 F.Supp. 246, 248 (D.Mass.1994).

### III. *CONCLUSION*

For the foregoing reasons, I **GRANT** the plaintiffs' motion for a preliminary injunction.

**SO ORDERED.**

### ORDER

Pending further order of this Court, a preliminary injunction issues enjoining the defendant City of Worcester and its officers, agents, and servants, members and employees, and their successors in office, and all persons acting in concert with them or in their behalf from:

(1) Including in a bid specification, contract or purchase order, or otherwise utilizing or enforcing Chapter 2, Section 32 of the Revised Ordinances of the City of Worcester, which requires fifty percent of construction man-hours on public works

projects to be allocated to Worcester residents; and

(2) Requiring contractors to comply with Chapter 2, Section 32 of the Revised Ordinances of the City of Worcester as a condition of bidding on any public works project for the City of Worcester.

The plaintiffs in this case are no longer required to post a bond.

**SO ORDERED.**